IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2026 Session

## STATE OF TENNESSEE v. TONY BANKS AND TYRONE BANKS

**Appeal from the Criminal Court for Shelby County**
No. 23-04265   James Jones, Jr., Judge

_____

### No. W2025-00765-CCA-R3-CD

_____

The Defendants, Tony Banks and Tyrone Banks, were both convicted of misdemeanor assault following a bench trial, and they each received sentences of ten months. On appeal, the Defendants argue that the evidence was insufficient to support their convictions and that the trial court erred by allowing a State's witness to testify remotely through the use of a videoconferencing platform. After our review of the record and the applicable case law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which MATTHEW J. WILSON and STEVEN W. SWORD, JJ., joined.

Phyllis Aluko, District Public Defender; Barry W. Kuhn, Assistant District Public Defender (on appeal); and Eric Scott Hall (at trial), Memphis, Tennessee, for the appellant, Tony Banks.

Lance R. Chism (on appeal), and Jack Sherman (at trial), Memphis, Tennessee, for the appellant, Tyrone Banks.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Steve Mulroy, District Attorney General; and Haden Lawyer and Tyler Schembri, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    FACTUAL AND PROCEDURAL HISTORY

On November 14, 2023, a Shelby County grand jury charged both of the Defendants with one count of misdemeanor assault by knowingly causing bodily injury to Orenthal Rivers ("the victim"), a Class A misdemeanor.[1] *See* Tenn. Code Ann. § 39-13-101. Thereafter, the Defendants waived their rights to a jury trial and proceeded to a joint bench trial on January 14, 2025.

The State's proof at trial established that the Defendants and the victim had worked together as forklift operators in a distribution warehouse for Trane Technology, an air-conditioning supply company, in Memphis. "[A]ll three were pretty much in line, they were all turret, or sling reach truck operators, which is mainly known for picking," meaning that "they would go get things [from] the warehouse that had been ordered and bring them to another place to be shipped out." Prior to using one of the company's forklifts to perform these tasks, an operator was required to complete "a visual inspection," "log into" the forklift by scanning a badge or manually entering the operator's employee information, and use a keypad to "go through a checklist" and answer certain safety-related questions correctly. An operator was also required to wear a safety harness, which required use of a "heavy duty" metal lanyard to attach the operator's harness to the forklift.

On December 15, 2022, the victim arrived at work intending to work a "shift and a half" that day, meaning that he would work a first shift from 10:00 a.m. until 2:00 p.m. and that following a break, start a second shift working from 2:30 p.m. to 11:00 p.m. On the day in question, the victim logged into a particular forklift and worked his first shift ending at 2:00 p.m. He then took a fifteen-minute break for lunch before starting his second shift. Prior to taking this break, he left his badge hanging on the forklift he had been using so that no one else would log into it.

When the victim later returned to the same forklift for his second shift, Tyrone approached the victim and informed the victim that he had already logged into the forklift and had placed his personal belongings on it, thereby indicating that he intended to use the machine. However, the victim did not believe Tyrone because the victim could see that he was still logged into the forklift from when he had used it earlier that day and that it had not yet timed him out, which occurred after thirty minutes of non-use. The victim explained to Tyrone that he had been using the forklift that morning for his prior shift and told Tyrone to find another forklift. Tyrone retrieved his personal belongings from the

---

[1] Tony and Tyrone Banks are identical twin brothers. We will refer to them collectively as the Defendants but individually, when necessary, by their first names. We intend no disrespect in so doing.

forklift, and the victim resumed his work. The victim believed that this entire interaction lasted "[m]aybe a minute, if that." In the victim's opinion, although Tyrone "was saying something" as the victim drove away on the forklift, it was not an "altercation" because there were no yelling or threats exchanged. The victim further indicated that the company had a zero-tolerance policy for arguments and that there were managers nearby who would have intervened if there had been a visible disturbance or to whom either of them could have reported a hostile incident.

About ten minutes after the victim's interaction with Tyrone, the victim went to the office of the first-shift operation supervisor, Brion Broyles,[2] to turn in his scanning gun and pick up a new one for his second shift. The victim was wearing his safety harness at this time but did not have his metal lanyard with him. According to the victim, most operators left their lanyards on the forklift because it was heavy and would "drag you down in the back" if you left it on your harness. After a brief conversation with Mr. Broyles, the victim retrieved his scanning gun and left the office by walking down the hallway toward the production area, which was about twenty feet away. The victim did not mention any prior altercation with Tyrone to Mr. Broyles while he was inside Mr. Broyles's office.

The victim testified that, after leaving Mr. Broyles's office, he encountered the Defendants in the hallway. The Defendants were not wearing their safety harnesses. The victim did not see any reason to be on "alert" based upon his interaction with Tyrone earlier that day. As the victim walked towards the Defendants, they "step[ped] on each side," and the victim asked of them, "Are you ready to say excuse me?" At that point, one of the Defendants asked, "What about that lift?" By the time the victim responded "[w]hat," he was "struck with a metal object." The victim said that both of the Defendants hit him in the head with different metal lanyards before transitioning to hitting him with their fists. According to the victim, as the fight was being broken up, one of the Defendants said that "they ain't no 'B' word and they ain't nothing to play with, we'll kill you."

Mr. Broyles testified that the victim had come into his office on the day of the incident to retrieve a scanning gun, and within fifteen to twenty seconds of the victim's leaving his office, Mr. Broyles heard "loud banging noises" nearby. As Mr. Broyles stepped into the hallway to see what was happening, he observed the Defendants and the victim "in a tight fitted lock, fighting each other." Mr. Broyles saw blood in the hallway, although he did not actually observe the men hitting each other. Mr. Broyles and another supervisor, Mike Harris, separated the three men. To Mr. Broyles, it seemed like the Defendants "wanted more, they kept trying to go at [the victim], they kept trying to get past" Mr. Broyles to get to the victim. Because the situation was "very heated," Mr.

---

[2] Mr. Broyles, who was working at a distribution center in Hastings, Nebraska at the time of the Defendants' trial, testified through the use of Zoom, a videoconferencing platform.

Broyles escorted the victim to his office and locked the door so that the Defendants "could not get in." Mr. Harris walked the Defendants to the front of the facility for further directions from appropriate company personnel while Mr. Broyles and the victim remained inside Mr. Broyles's office.

Once inside his office, Mr. Broyles was able to examine the victim's injuries, and he noticed that "the left side of [the victim's] face was beaten very badly, very, very bruised up, whelped up and scratched up." The victim was also "bleeding in pretty much multiple places on his face." The victim described that he suffered "cuts in [his] head, abrasions, bruises from where [he] was hit with a metal object" and that he had blood "dripping down" from his head and nose.

Mr. Broyles testified that he did not recall seeing any injuries to the Defendants when he encountered the men fighting in the hallway. Accordingly, Mr. Broyles determined that the blood he saw in the hallway belonged to the victim. A photograph of this hallway was entered as an exhibit. Mr. Broyles also testified that, after the fight was disbanded, he observed a metal lanyard lying on the hallway floor, on which he thought he saw "a few spots of blood." Mr. Broyles picked up the lanyard because he "realized it was probably used" in the fight; while it was not "weird" to see a lanyard in the hallway, it was "weird" to see blood on it. A photograph of a metal lanyard was introduced as a trial exhibit, although Mr. Broyles could not say for certain whether this was the same metal lanyard he observed in the hallway that day; according to Mr. Broyles, the floor tile in the photograph was different than the tile in the hallway in front of his office.

Emergency Medical Services ("EMS") treated the victim's injuries at the scene. The victim declined an ambulance ride to the hospital since he was already "patched up" and the bill for an ambulance ride would be high. The victim's injuries were photographed that day, and these photographs were entered as an exhibit. According to the victim, there was "blood all over [his] pullover" shirt, but the EMS technicians took the pullover off to determine whether he had any additional injuries, so the pullover was not seen in the photographs. The victim testified that he began feeling pain after the beating occurred and that he talked to his doctor about possible head injuries at his next "regular checkup."

Memphis Police Department Sergeant Daryl Mathis also investigated this incident. Although he did not go out to the company to investigate at the time of the incident, Sgt. Mathis subsequently spoke with the victim, as well as Mr. Broyles and the Defendants, about what had happened that day. According to Sgt. Mathis, the Defendants said that the victim was the first aggressor, which differed from the account given by the victim, who had indicated the opposite. Sgt. Mathis noticed that the Defendants had no visible injuries when he spoke to them, whereas it appeared the victim "had been struck with something"

- 4 -

given that he "had some gashes" on his face and had "a bandage on his eye." Additionally, Mr. Broyles told Sgt. Mathis that Tyrone had to be restrained and escorted off the property following the altercation because he "was very upset, irate, cursing, [and] yelling." Sgt. Mathis also confirmed that the Defendants were later terminated from their jobs at Trane after an internal investigation was conducted by the company. For these reasons, Sgt. Mathis ultimately determined that the victim's account was more credible, concluding that the Defendants were, in fact, the first aggressors, and he made his charging decision accordingly.

After the trial court denied the Defendants' motion for judgment of acquittal, the forty-six-year-old Defendants both testified in their own defense. The Defendants testified that, prior to going to work at their jobs as forklift operators for Trane on December 15, 2022, they had received pain medicine injections that morning for certain injuries—Tyrone into his neck and Tony into his lower back. Tyrone indicated that he was also recovering from a concussion, as well as suffering from a heart condition at the time. Their version of the events that took place that day after their arrival at work follows.

When the Defendants arrived at work, only one forklift was available in the front "charging station" area of the warehouse. Tyrone examined the forklift and saw that no identification or badge had been placed on it by another employee, so he put his badge and "drinking cooler" on the forklift and logged into the machine. He and Tony then proceeded to the required safety meeting held before each shift.

After the conclusion of the safety meeting, Tony went in search of his own forklift to use, and Tyrone returned to the forklift on which he had previously left his belongings, only to find the victim positioned close by the machine. Tyrone said to the victim, "Hey man, what's going on," but the victim, who seemed moody, replied, "Man, I don't want to talk." When Tyrone continued to inquire of the victim, "I know you see my badge hanging on the forklift," and "Excuse me, are we going to talk, or are we ain't going to talk," the victim ignored him. The victim then proceeded to log Tyrone off the forklift, prompting Tyrone to acquiesce and tell the victim that he could "have the forklift." The victim then "got disrespectful" and exclaimed, "Come back and get your s--t." Although Tyrone turned around to comply, the victim still tried to drive off with Tyrone's belongings on the forklift. After Tyrone was able to "snatch[]" his stuff off the forklift, he began walking away, which prompted the victim to stand up on the forklift and say to Tyrone, "Yeah, I took you real good."

Tyrone explained that he began walking toward his "lead[']s" location to request "light duty," as well as to report the incident with the victim that had just occurred. According to Tyrone, the victim drove the forklift ahead of him, parked it, "jumped off,"

- 5 -

and continued to walk next to him. All the while, the victim continued to "taunt" and "little boy" Tyrone, meaning to "basically punk [him] out in front of everybody at work." When Tyrone's lead was not available, Tyrone proceeded toward Mr. Broyles's office, but as he reached the hallway, the victim "tried to block [his] path." The victim said, "What you trying to do, rat on me, you trying to report me?" Tyrone said, "Man get out of my face[,]" and tried to walk around the victim. But, according to Tyrone, a fight ensued, starting with the victim's grabbing Tyrone by the shirt and swinging at him. So, in self-defense, Tyrone "swung back" hitting the victim in the shoulder or neck area, and Tyrone "grabbed [the victim] by his face," digging his fingernails into the victim's skin. Tyrone said that he was merely trying to stave off the victim until someone could intervene; he did not want to engage in any fight, given that he had other health conditions and had just received treatment for his neck injury that morning. Tyrone estimated that the entire incident lasted no more than thirty seconds before it was broken up.

Tony, after looking unsuccessfully in other areas of the warehouse for another forklift to operate, had returned to the center of the warehouse where he saw his brother walking toward Mr. Broyles's office. Tony believed that Tyrone might have been going to ask for light duty or the day off due to his medical status, so Tony began to follow Tyrone because they were riding in the same car together. Tony was approximately fifteen or twenty feet behind Tyrone when Tyrone reached the hallway leading to the supervisor's office, at which point the victim emerged from the hallway's entrance asking if Tyrone intended to lodge a report against the victim. Tony, unaware of the prior interaction that had taken place earlier that day, saw the scuffle between Tyrone and the victim that ensued. According to Tony, the victim struck first, grabbing Tyrone by the shirt and hitting him in the face, trying to prevent Tyrone from going to Mr. Broyles's office, and Tyrone was merely defending himself. As Tony moved closer to intervene, concerned for his brother's well-being, he yelled at the victim, "Get off my brother, what you doing." Tony explained that he was still some distance away when Mr. Broyles came out of his office and began attempting to break up the fight between Tyrone and the victim. Tony reached the scuffle, intending to step in to help Mr. Broyles, but the fight was basically over by that time. Tony stated that he "never swung a lick" during the incident and that he never saw any blood.

Both of the Defendants denied having a metal lanyard with them during the altercation. Both also faced potential parole revocations if found guilty of this offense.

Following the conclusion of proof, the trial court found both of the Defendants guilty as charged. At a subsequent sentencing hearing, the trial court imposed ten-month sentences for the Defendants, which were aligned concurrently with other sentences not at

issue in this appeal. Neither of the Defendants filed a motion for new trial.[3] Thereafter, both of the Defendants filed untimely notices of appeal, but this court later waived the timely filing requirement and consolidated both cases for review.

## II.   ANALYSIS

### A.   Sufficiency

On appeal, the Defendants contend that their misdemeanor assault convictions are not supported by sufficient evidence because the State's proof was less credible than theirs. Specifically, in this regard, the Defendants note that Mr. Broyles did not see any blows struck, and no eye witnesses corroborated the victim's account that the Defendants were the first aggressors; only the victim was wearing a safety harness at the time of the altercation; only one metal lanyard was found at the scene, which did not appear to have blood on it in the photograph, and Mr. Broyles was not certain that he saw blood on the lanyard; the victim's alleged injuries were inconsistent with his claim that he had been beaten with two metal lanyards; and the victim's pullover, which had supposedly been covered in blood, was unaccounted for. According to the Defendants, simply because the victim lost the fight does not support a finding that they were the first aggressors; it was unlikely they would have instigated any fight because they had both received treatment for preexisting spinal and neck injuries earlier that day; and their versions corroborated each other's. The State responds that credibility determinations are for the finder of fact and, therefore, the evidence was sufficient to support the Defendants' convictions for misdemeanor assault.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*,

---

[3] The Defendants were not required to file a motion for new trial in order to preserve their issues on appeal under the Rules of Appellate Procedure because they were convicted at a bench trial. *See* Tenn. R. App. P. 3(e) (providing that "in all cases *tried by a jury*, no issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for a new trial" (emphasis added)); *State v. Myers*, 581 S.W.3d 173, 187 (Tenn. 2019). After the time period for filing either a motion for new trial or a notice of appeal had passed, new attorneys were appointed to represent both of the Defendants for appellate purposes.

443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict . . . accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835. "In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978)).

As pertinent to this case, "[a] person commits assault who . . . [i]ntentionally, knowingly or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" *Id.* § -11-106(a)(3).

While the Defendants claim that their version of events was more credible than the victim's, a victim's testimony alone is sufficient to support a guilty verdict. *See State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'" (first quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); and then citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981))); *see also State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that a victim's testimony was sufficient to support a conviction for rape of a child, despite some inconsistencies in the victim's testimony). The victim testified that he worked his first shift at Trane until 2:00 p.m. on December 15, 2022, before taking a fifteen-minute break to eat lunch. At the time the victim took his break, he remained logged into the forklift that he had been using, and he left his identification badge hanging on the machine to indicate to others that he was still using it. According to the victim, when he returned to the forklift for his second shift, he was still logged into the machine, but Tyrone approached him and said that he intended to use the forklift. After a brief discussion, Tyrone retrieved his personal belongings from

the forklift, and the victim resumed his work. The victim said that he did not think much of the interaction and proceeded to Mr. Broyles's office to retrieve his equipment for the upcoming shift. When the victim left Mr. Broyles's office, he encountered the Defendants in the hallway, who, apparently angry about the prior conversation, were lying in wait for him. The victim testified that, as he approached the Defendants, they "step[ped] on each side," and as he walked between them, they hit him in the head with heavy metal lanyards and then with their fists. According to the victim, one of the Defendants said to him that "they ain't no 'B' word and they ain't nothing to play with, we'll kill you."

And, despite Mr. Broyles's not being an eyewitness to the beginning of the fight, Mr. Broyles's testimony still corroborated the victim's account. Mr. Broyles confirmed that the victim had come to his office that afternoon and retrieved a scanning gun for the victim's second shift. Less than thirty seconds after the victim had left Mr. Broyles's office, Mr. Broyles heard "loud banging noises." When Mr. Broyles exited his office to assess the cause of the disturbance, he saw the Defendants and the victim "in a tight fitted lock, fighting each other," and he saw blood in the hallway. In addition, Mr. Broyles found a metal lanyard with "a few spots of blood" on it nearby. Mr. Broyles and Mr. Harris were able to separate the three men, but according to Mr. Broyles, it seemed like the Defendants kept trying to go after the victim. Mr. Broyles had to take the victim to his office and lock the door to keep the Defendants at bay.

The victim suffered cuts and scratches to his face, which were sufficient to draw blood, and EMS treated these injuries at the scene. The victim described his injuries, as did Mr. Broyles, who had been able to observe those injuries while he waited in his office with the victim following the fight. The victim's injuries were photographed, and the photographs were entered as a trial exhibit. Sgt. Mathis also later saw the victim's cuts and bandages. Moreover, Tyrone acknowledged that he swung at the victim and dug his fingernails into the victim's face. These injuries were sufficient to establish the necessary bodily injury element of the Defendants' assault convictions. *See* Tenn. Code Ann. § 39-11-106(a)(3).

Moreover, neither Mr. Broyles nor Sgt. Mathis observed any injuries to either of the Defendants. Mr. Broyles also told Sgt. Mathis that Tyrone had to be restrained and escorted off the property following the altercation because he "was very upset, irate, cursing, [and] yelling." Finally, according to Sgt. Mathis, based upon the company's subsequent internal investigation into the altercation, the Defendants were terminated from their jobs.

Credibility determinations were for the trial court as the trier of fact, and we defer to those on appeal. *Bland*, 958 S.W.2d at 659. By its verdict, the trial court resolved any conflicts in the proof in the State's favor and determined that the Defendants were the first

aggressors. Accordingly, the evidence was sufficient to support the Defendants' convictions for assault.

## B.     Confrontation Clause

The trial court allowed Mr. Broyles to testify at trial remotely via Zoom's two-way videoconferencing feature. No objection to this procedure was lodged in the trial court. However, on appeal, the Defendants argue that this procedure violated their constitutional right of confrontation under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. They submit that the trial court failed to affirmatively engage in the analysis outlined by *Maryland v. Craig*, 497 U.S. 836, 850 (1990), requiring a finding of necessity and reliability to deny the Defendants their right to confrontation and permit questioning of Mr. Broyles by videoconferencing. The State counters that the Defendants have waived the issue for failure to object in the trial court and have failed to establish their entitlement to plain error relief.

### 1.     Pertinent Facts

On January 13, 2025, the day before trial began, the attorneys discussed the status of the case. The following colloquy took place on the record:

> [THE PROSECUTOR]: [The Defendants' lawyers] are here, essentially checking in on the [Defendants'] situation and I was letting them know that it appears that it is either going to be a bench trial, later this week, or most likely a continuance, just because it would be difficult to find a transfer, but I just wanted to say that on the record.
>
> [DEFENDANT TONY'S COUNSEL]: And they are on their way up, Judge and we will speak with them.
>
> But, I think that they are going to be okay with a bench trial.
>
> THE COURT: Right. And I've heard, just because I know we were going to try to send a trial to [Division] VIII and Judge Craft is available, so if y'all want to talk to Judge Craft, I am sure he will be able to accommodate you.
>
> But, I mean, I'll be happy to do a bench trial, later this week.

[DEFENDANT TONY'S COUNSEL]: Later this week sounds great, Judge.

THE COURT: Alright. Talk to you[r] clients and we can have them brought up and we will let them know, also.

[DEFENDANT TONY'S COUNSEL]: Thank you, Judge.

[DEFENDANT TYRONE'S COUNSEL]: Thank you.

Later that same day, the attorneys returned to court, and the trial court informed them that "[a]ll the other trials ha[d] fallen through," so there was a jury venire available to them "out there waiting now." The Defendants' attorneys and the prosecutor, nonetheless, continued to affirm that a bench trial was acceptable for this Class A misdemeanor charge. The trial court, then, released the jury venire. At some subsequent point, the Defendants were brought into the courtroom and questioned about waiving their right to a jury trial. Both of the Defendants affirmed that they wished to waive this right and proceed with a bench trial. The Defendants were similarly questioned the following day, before the trial began, and the trial court determined that their waivers were knowingly and voluntarily entered. The Defendants also executed written waivers, which appear in the record on appeal.

The first mention in the record of Mr. Broyles's testifying by Zoom occurred when Mr. Broyles was called as the State's first witness. After some technical issues with the videoconferencing feature arose, the State called Sgt. Mathis to testify first instead, presumably to allow time for the technical issues to be addressed. When Sgt. Mathis completed his testimony, the State recalled Mr. Broyles, and he proceeded to testify through the use of Zoom without any further discussion on the record of the prior technical issues. At the outset of Mr. Broyles's testimony, the prosecutor observed, "I see you are working right now," and asked Mr. Broyles where he was currently working. Mr. Broyles replied that he was working for a distribution center in Hastings, Nebraska.

After the initial difficulties, Mr. Broyles testified via Zoom, in large part without incident. There were only three occasions that any potential impediment with the two-way video feature was noted. First, on direct examination, Mr. Broyles indicated that he could not hear what took place following an objection from Defendant Tony's lawyer. Second, also on direct, it was noted that Mr. Broyles's testimony "cut out just a little bit," and he was asked to repeat his answer. Third, on cross-examination, Mr. Broyles was shown a picture of the metal lanyard found in the hallway and asked if there was any visible blood on the lanyard, which prompted Defendant Tony's counsel to observe that Mr. Broyles was

"at a very big disadvantage for looking at this over a small screen, over [Z]oom[.]" Mr. Broyles then indicated that he did not see any blood in the photograph. These were the only references to the use of videoconferencing during the trial proceedings.

In denying the Defendants' motions for judgment of acquittal, the trial court stated, "We had the supervisor testifying that he came out of his office, had to break up the fight and that after, or while trying to break up the fight the [D]efendants continued to pursue, or continued to try to engage in the altercation." During its closing arguments, the State highlighted portions of Mr. Broyles's testimony, including that the Defendants, post-fight, were cursing and refusing to disengage, and reiterating Mr. Broyles's description of the victim's injuries. Lastly, in ruling that the evidence was sufficient to support a conviction for assault, the trial court made the following comments:

> [T]he Court, having listened to the testimony believes that at times there are situations in which victims may embellish a situation, defendants may minimize a situation and vice-versa.

> But, we have an individual that does not have a dog in the fight and in which the Court finds to be a credible witness that makes one story more credible than the other.

> The Court finds that with regard to this count for [the Defendants] that the State has met their burden.

> . . . .

> The charge requires bodily injury and bodily injury is defined as being something as minimal as an abrasion, a cut, a bruise, all things which were testified [to] by an individual who did not have a dog in the fight, the supervisor, Mr. Broyles.

### 2. Right to Confrontation

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution contains a similar provision stating "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn.

Const. art. I, § 9. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845. The Confrontation Clause therefore essentially ensures the right to physically face witnesses and the right to cross-examine witnesses before the trier of fact. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988); *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007).

In *Craig*, however, the United States Supreme Court noted that it had "never held . . . that the Confrontation Clause guarantees criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." 497 U.S. at 844. It stated that the preference for face-to-face confrontation "must occasionally give way to considerations of public policy and the necessities of the case.'" *Id.* at 849 (quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895)). The Tennessee Supreme Court has observed the same. *State v. Rimmer*, 623 S.W.3d 235, 282 (Tenn. 2021).

*Craig* involved a Confrontation Clause challenge to a Maryland law that allowed a child sexual assault victim to testify via one-way, closed-circuit television if the trial judge determined "that testimony by the child victim in the courtroom [would] result in the child suffering serious emotional distress such that the child [could not] reasonably communicate." 497 U.S. at 840-41 (quoting Md. Cts. & Jud. Proc. Code Ann. § 9-102(a)(1)(ii) (1989)). If this determination was made, the Maryland law allowed for the child witness, prosecutor, and defense counsel to withdraw to a separate room where the examination of the child was transmitted to the courtroom for display to the judge, jury, and defendant. *Id.* at 841. During this time, the defendant was able to talk with his counsel by telephone, and the trial judge conducted the proceedings in the same manner as if the examination were being held in the courtroom, but the witness could not see the defendant. *Id.*

Recognizing that Sixth Amendment rights must be "interpreted in the context of the necessities of trial and the adversary process[,]" the *Craig* Court held "that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850 (citations omitted). The Court determined that the reliability prong had been met in that case because the presence of elements of confrontation other than face-to-face confrontation—*i.e.*, "oath, cross-examination, and observation of the witness' demeanor"—"adequately ensure[d] that the testimony [was] both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851. These reliability safeguards, the Court noted, "preserve[d] the essence of effective confrontation" in that case. *Id.* at 857. As for the

- 13 -

necessity prong, the Court stated that "the critical inquiry" was "whether use of the procedure [utilized therein was] necessary to further an important state interest." *Id.* at 852. The Court then remanded the case for the trial court to make a case-specific finding that the relaxation of face-to-face confrontation was necessary because testimony by the child in the courtroom, in the presence of the defendant, would result in the child suffering serious emotional distress such that the child could not reasonably communicate. *Id.* at 858.

To date, the United States Supreme Court has never explicitly extended the balancing test of *Craig* to two-way video testimony such as was utilized in this case. *See State v. Rogerson*, 855 N.W.2d 495, 500 (Iowa 2014); *see also Wrotten v. New York*, 560 U.S. 959, 959 (2010) (Sotomayor, J., respecting denial of petition for writ of certiorari) (noting the "strikingly different context" of testimony received via one-way, closed-circuit television and two-way videoconferencing and stating that the question of and standards for the use of two-way videoconferencing testimony in a criminal defendant's trial "is not obviously answered by *Maryland v. Craig*"). However, a prior panel of this court has concluded, after an exhaustive caselaw review, that "the test articulated in *Craig* provides the bare minimum protections for testimony via two-way communication." *State v. Seale*, No. M2019-01913-CCA-R9-CD, 2020 WL 4045227, *8 (Tenn. Crim. App. July 20, 2020); *see also State v. Holmes*, No. E2021-01489-CCA-R3-CD, 2022 WL 16736968, at *16 (Tenn. Crim. App. Nov. 7, 2022) (noting, in the context of plain error review, that the *Seale* panel had previously applied the standard set forth in *Craig* to testimony received via two-way videoconferencing technology and determined that it may be used in some circumstances without violating a defendant's right to confrontation).

### 3. Standard of Review

First, we must determine the appropriate standard of review. *See State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). The State argues that the Defendants have waived plenary review of their confrontation issue by failing to lodge a contemporaneous objection in the trial court to this videoconferencing procedure. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Defendant Tyrone acknowledges on appeal that this issue is waived for this reason, but he contends, nonetheless, that this procedure violated his confrontation rights, entitling him to relief via the plain error doctrine. *See* Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless . . . error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

- 14 -

However, Defendant Tony ostensibly argues that, despite the lack of an objection, the issue is subject to plenary review because no written waiver was effectuated nor was he questioned about waiving his confrontation rights, and there is a presumption against the waiver of a fundamental constitutional right from a silent record, citing *Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999) (concluding that the right to testify at one's own trial was a fundamental right that could only be waived personally by the defendant). Defendant Tony would have us extend the reach of the prophylactic procedure outlined in *Momon*—designed to ensure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent—to instances where a defendant's confrontation rights are infringed upon by the State's use of two-way videoconferencing testimony. Essentially, Defendant Tony contends that his challenge to the propriety of such two-way videoconferencing testimony is entitled to plenary review despite his lack of objection because the State did not affirmatively demonstrate that waiver of any confrontation claim under *Craig* was knowing and intelligent. Alternatively, he submits that he is entitled to relief via the plain error doctrine.

It is well settled that a criminal defendant may waive rights guaranteed to him under the Constitution. *See State v. Hamm*, 589 S.W.3d 765, 775 (Tenn. 2019) (citing *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004)). The manner in which a right may be waived, however, varies according to the nature of the right at stake. *See Momon*, 18 S.W.3d at 161-62; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.") (citations omitted)). For certain fundamental rights, the defendant must personally make an informed decision as to waiver. *See Momon*, 18 S.W.3d at 161-62; *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (observing that a fundamental constitutional right that is personal to the defendant may only be waived if there is evidence in the record demonstrating "an intentional relinquishment or abandonment of a known right or privilege"). For other rights, however, waiver may be effectuated by the actions of counsel. *New York v. Hill*, 528 U.S. 110, 114 (2000).

It is true that the trial court in this case did not specifically determine whether the deprivation of physical face-to-face confrontation by Mr. Broyles's two-way videoconferencing testimony comported with the Sixth Amendment utilizing the *Craig* analysis, *i.e.*, whether the deprivation was necessary to further an important public policy and whether the reliability of Mr. Broyles's testimony was otherwise assured. But this was largely, if not entirely, because the Defendants did not object to the procedure.

"As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice

of which can be charged upon the attorney." *Hill*, 528 U.S. at 115 (citation modified). Typically, the decision regarding what evidentiary objections to raise, what arguments to pursue, and what agreements to conclude regarding the admission of evidence is the type of tactical trial decision that generally may be waived by trial counsel acting alone. *Id.*; *see also Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (stating that courts generally defer to counsel's strategic and tactical decisions if they are informed decisions based on adequate preparation); *Daugherty v. State*, 470 S.W.2d 865, 866 (Tenn. Crim. App. 1971) ("Not only is technical perfection of counsel not necessarily demanded by Constitutional standards, but we also know that the failure to object to evidence is often a matter of trial strategy, not a reflection of oversight or incompetence."). Accordingly, confrontation rights, like the one at issue in this case, can be waived, either by a defendant's actions or by those of his attorney, either expressly or impliedly, by the failure to object to the offending evidence or procedure. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 n.3 (2009) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence."); *see also Hemphill v. New York*, 595 U.S. 140, 157 n.* (2022) (Alito, J., concurring) (stating that a defendant can impliedly waive his Sixth Amendment right to confrontation through his conduct or that of counsel); *State v. Parker*, 350 S.W.3d 883, 900 (Tenn. 2011) (holding that a confrontation issue regarding the nontestimonial nature of a hearsay statement had been waived due to the defendant's failure to raise the issue in a motion for new trial and declining to review the issue for plain error when the defendant did not request such).

Defendant Tony has not cited, and we have not found, any case that requires a defendant to affirmatively acknowledge his awareness of his right to confrontation in this instance. *See State v. Rimmer*, 250 S.W.3d 12, 28 (Tenn. 2008) (holding that a criminal defendant does not have "to acknowledge his awareness of a limited cross-examination rule" if he chooses to testify to collateral mitigating factors in a capital sentencing hearing). Absent a clear directive from a higher court, we decline Defendant Tony's invitation to extend the prophylactic procedure in *Momon* (involving a criminal defendant's personal right to testify) to a trial court's use of a videoconferencing platform to receive testimony when no objection to this procedure is lodged. Thus, we agree with the State and Defendant Tyrone that the Defendants' confrontation issue has been waived and is only reviewable for plain error. *See State v. Vance*, 596 S.W.3d 229, 253-54 (Tenn. 2020) (determining that the defendant was entitled only to review under the plain error doctrine when he objected on a non-constitutional ground in the trial court and raised a confrontation issue for the first time on appeal); *see also Holmes*, 2022 WL 16736968, at *16 (concluding that the defendant had waived his confrontation challenge by failing to object in the trial court to a witness' testifying remotely and utilizing the plain error doctrine, although not specifically discussing the appropriate standard of appellate review, which was not raised as an issue).

4.    Analysis

We turn to review the Defendants' confrontation issue by way of the plain error doctrine.  In conducting plain error review, our court will reverse only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. App. P. 36(b).  All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established.  *Smith*, 24 S.W.3d at 283.  In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial."  *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).  Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).  A defendant has the burden of persuading the appellate court that plain error exists.  *Bledsoe*, 226 S.W.3d at 355.

There is no question in this case that the Defendants were denied their right to physically confront Mr. Broyles face-to-face.  And, as discussed above, a panel of this court has held that "*Craig* provides the bare minimum protections for testimony via two-way communication."  *Seale*, 2020 WL 4045227, at *8.  However, as also discussed above, the Defendants have not provided any authority, and we know of none, that requires a trial court to affirmatively engage in the analysis outlined by *Craig* before permitting questioning of a witness by videoconferencing.

From the record, we surmise that Mr. Broyles testified via Zoom because he was working in Nebraska at the time of the Defendants' trial.  In fact, from the prosecutor's statement to Mr. Broyles that it appeared he was "working right now," Mr. Broyles was seemingly at his place of work in Nebraska while testifying.  Obviously, traveling from Nebraska to Tennessee while maintaining a job can place a significant burden on a witness.

Any additional considerations as to what necessitated Mr. Broyles's testifying via Zoom are not apparent from the record due to the lack of an objection. Because testimony via a videoconferencing platform might sometimes be appropriate when a compelling public interest exists to justify its use, *see Seale*, 2020 WL 4045227, at *8, we cannot say that a clear and unequivocal rule of law has been breached in this instance. Indeed, a panel of this court has held that the trial court did not plainly err in allowing a witness's remote two-way video testimony for this very reason. *Holmes*, 2022 WL 16736968, at *16. "To reach a contrary conclusion would result in an ambush of the trial court by permitting [a] defendant to raise a claim on appeal that his or her counsel . . . had abandoned in the trial court." *State v. Holness*, 958 A.2d 754, 759 (Conn. 2008).

Furthermore, we glean from the January 13, 2025 transcript that the Defendants were interested in expediting their case by having it heard by a trial judge rather than a jury of their peers. It appears from that transcript that the Defendants were willing to waive their right to a jury trial in their initial efforts to have their case proceed forthwith, rather than have it transferred to another division. They later held steadfast to their waiver of a jury trial despite a jury venire's becoming available to them later that same day, and they executed written waivers reflecting such. Undoubtedly, raising an objection to the videoconferencing procedure utilized in this case would have extended their case for an indefinite amount of time due to Mr. Broyles's location in Nebraska and the time that it would have taken to secure his physical presence in Tennessee. Accordingly, the record belies the Defendants' assertion that no tactical reason existed to waive such an objection.

As to damage done to their confrontation right, the Defendants note that Mr. Broyles was the "only independent witness to the events in question" and that he was not present in the courtroom for the trier of fact to view his demeanor and for defense counsel to engage in effective cross-examination. They make this observation particularly in response to the trial court's comments relying on Mr. Broyles's testimony to support its sufficiency finding. However, the plain text of the Confrontation Clause applies to "witnesses against [the accused]," without regard to the relative importance of any particular witness's testimony. Moreover, the decision to withhold any objection was certainly not imprudent, given that the presence of elements of confrontation other than face-to-face confrontation—*i.e.*, "oath, cross-examination, and observation of the witness' demeanor"—"adequately ensure[d] that the testimony [was] both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Craig*, 497 U.S. at 851. The video technology seemingly appeared to function properly, aside from one instance when Mr. Broyles could not hear the courtroom discussion regarding an objection and another when he was asked to repeat a response. And, other than noting the small size of the video frame used to show Mr. Broyles a photograph of the metal lanyard, it does not appear that the Defendants'

attorneys' lack of physical presence when questioning Mr. Broyles hindered their effective cross-examination of the witness. Accordingly, consideration of the error is not necessary to do substantial justice or to correct an adverse effect to a substantial right of the Defendants.

Importantly, we reiterate that the decision regarding what evidentiary objections to raise and what agreements to conclude regarding the admission of evidence is the type of tactical trial decision that generally may be waived by trial counsel acting alone. *See Cauthern*, 145 S.W.3d at 600; *Daugherty*, 470 S.W.2d at 866. In addition to possibly not wanting to prolong the case, the Defendants' trial attorneys might have believed that Mr. Broyles's testimony via Zoom would be less impactful because of the use of a videoconferencing platform. Here, the record here does not clearly establish what occurred in the trial court with regard to the basis for the Defendants' attorneys' decision to forgo raising a confrontation objection to the use of Zoom because such was never discussed on the record in any way, and new lawyers are representing the Defendants on appeal. For the purposes of waiver here, the Defendants are bound by their attorneys' actions or, in this case, inactions on their behalf. *Cf. House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995) (holding that, in the post-conviction context, waiver is to be determined by an objective standard under which a petitioner is bound by the actions or inactions of counsel). Absent a demonstration of ineffective assistance of counsel, the word from their attorneys on such matters is the last. *See Cauthern*, 145 S.W.3d at 600. Because the trial court did not plainly err, the Defendants are not entitled to relief based upon Mr. Broyles's remote two-way videoconferencing testimony.

### III. CONCLUSION

In accordance with the foregoing, we affirm the judgments of the trial court.


 s/Kyle A. Hixson
KYLE A. HIXSON, JUDGE

- 19 -